Queirolo v. Highridge Condo. Owners Ass'n, No. 200-3-07 Rdcv (Cohen, J., May 17, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT
# RUTLAND COUNTY

| | | |
|---|---|---|
| **NANCY SCHILLING QUEIROLO, f/k/a NANCY SCHILLING, EDGARDO QUEIROLO, and NANCY SCHILLING QUEIROLO and EDGARDO QUEIROLO, as Custodian and Guardian for Katrina E. Queirolo, Wyatt Queirolo, and Tessa Queirolo (minors)** | ) ) ) ) ) ) ) ) ) | **Rutland Superior Court** **Docket No. 200-3-07 Rdcv** |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| **HIGHRIDGE CONDOMINIUM OWNERS ASSOCIATION, d/b/a HIGHRIDGE OWNERS ASSOCIATION and d/b/a HIGHRIDGE ASSOCIATION,** | ) ) ) ) ) ) | |
| **Defendant** | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

This case is about Highridge Condominium Owners Association changing the undivided-interest-assessment percentage for Nancy and Eduardo Queirolo's condominium unit. The change in assessment percentage resulted in higher common expense dues, which the Queirolos did not pay. The Queirolos brought suit seeking to have their assessment percentage returned to its original level and to nullify charges by the Association for past due balance and attorney's fees. The Association seeks to foreclose on the Queirolos' condominium unit because of unpaid dues.

The Queirolos are represented by Robert I. Tepper, Esq. Highridge Condominium Owners Association is represented by Michelle A. Kenny, Esq. and Rodney E. McPhee, Esq.

## FINDINGS OF FACT

(1)     The Highridge Condominium Owners Association is a condominium association pursuant to the Condominium Ownership Act as provided in Chapter 15 of Title 27 of the Vermont Statutes Annotated.

(2)     Nancy Schilling Queirolo and Edgardo Queirolo, as custodians and guardians for Katrina E. Queirolo, Wyatt Queirolo, and Tessa Queirolo (minors), are the owners of Unit Q-3 of the Highridge Condominiums.

(3)     Nancy Schilling Queirolo acquired her initial interest in Unit Q-3 by Warranty Deed to William Schilling, Ella Schilling, and Nancy Schilling, dated December 14, 1989, as recorded December 18, 1989, at Book 118, Page 60, et seq., of the Killington Vermont Land Records.

(4)     William and Nancy Schilling conveyed all of their right, title, and interest in Unit Q-3 to Nancy Schilling Queirolo, Edgardo Queirolo, Katrina E. Queirolo, Wyatt Queirolo, and Tessa Queirolo by Quitclaim Deed in February 2006.

(5)     The Queirolo's ownership of Unit Q-3 was subject to the Declaration of Condominium and Bylaws dated November 17, 1983, as recorded at Book 63, Page 319 et. seq., in the Town of Sherburne, now known as Killington, Land Records and Amendment to Declaration of Condominium ("the Declaration") bearing the date of May 21, 1990, as recorded May 25, 1990, at Book 119, Page 454 et seq., of the Town of Killington Land Records.

(6)     Since June 19, 2008, The Queirolo's ownership of Unit Q-3 has been subject to the Amended and Restated Declaration and Amended and Restated Bylaws

2

("Amended Declaration") dated June 12, 2008, and recorded June 19, 2008, at Book 304, Page 92, et. seq., in the Town of Killington Land Records.

(7) The Amended Declaration of 2008 is not applicable to the events in this dispute.

(8) Highridge Condominiums is a 118-unit condominium community composed of several buildings, each containing several residential units.

(9) Building Q contains three units.

(10) Building Q was built in accordance with a building permit issued by the Vermont Agency of Natural Resources. The permit established that "[t]he revised building Q is now approved for a total of 3 units with 9 bedrooms. The total sewage allocated for building Q is 1236 gallons per day."

(11) The permit has not been modified or amended to allow for bedrooms to be added to any units in Building Q, in addition to the approved nine bedrooms.

(12) Building Q at Highridge has the largest individual units compared with all other units at Highridge.

(13) The Building Q units are larger than those designated as four-bedroom units at Highridge.

(14) The as-built plans for Building Q establish three units.

(15) The plans identify Unit Q-3 as a three-bedroom, four-bathroom unit, with a below grade area identified as "FR"—a family room.

(16) According to an officer of Association, Stephen Durkee, the lower level of Unit Q-3 was intended to be and was designed, built, and filed as part of the Highridge Condominium regime, as a family room to provide recreational

3

amenities to the unit that were desirable to the marketplace for potential purchasers at Highridge.

(17)     At no time during the Queirolos' ownership of Unit Q-3 has the unit been physically altered from that as shown in the as-built plans.

(18)     Under Section 11(b) of the Declaration, unit owners are entitled to use the common areas and facilities in accordance with the purposes for which they are intended without hindering or encroaching upon the rights of any other unit owner.

(19)     Common assessments levied by the Association against Highridge unit owners generally represent the costs and expenses of operation and maintenance of the Highridge Condominiums.

(20)     The expenses of the Association, in the operation of the condominium regime, are born by each condominium unit owner at a percentage of the whole, which percentage of common expenses attributable to a given unit is arrived at by establishing a nominal value to each condominium unit based on the number of bedrooms and bathrooms within each unit.

(21)     The common expenses of Highridge Condominiums are charged to each unit according to the declared percentage of undivided interest in the common areas and facilities as provided by 27 V.S.A. § 1310.

(22)     The percentage of the undivided interest of each unit (nominal value) is permanent in character as provided by 27 V.S.A. § 1306(b), Section 5 of the Declaration, and the Bylaws.

(23)     Each unit's percentage interest is based on bedrooms, bathrooms, and lofts. This establishes a rational basis for determining the relative usage of the common areas and facilities by each Highridge unit.

(24)     The percentage interest allocated for each unit at Highridge Condominiums is defined by the "nominal value" that is calculated pursuant to the Declaration by adding six (6) points for each unit, three (3) points for each bedroom, one (1) point for each bathroom, and two (2) points for each loft. The governing documents also refer to the "nominal value" as ten (10) points for each unit including one bedroom and one bathroom, three (3) points for each additional bedroom, one (1) point for each additional bathroom, and two (2) points for each loft. Regardless of which point system is applied, the resulting nominal value is the same.

(25)     The percentage of undivided interest in common areas and the nominal value of Unit Q-3 was first established in Amendment to Declaration of Condominium dated May 21, 1990, and recorded May 25, 1990, at Book 119, page 454 of the Killington Land Records.

(26)     The Declaration establishes Unit Q-3 as having a nominal value of 19 and a corresponding percentage interest of 1.1053%.

(27)     At no time pertinent to this cause of action has the undivided interest of Unit Q-3 been altered by amendment to the Declaration of Condominium duly recorded.

5

(28) The Declaration and Bylaws provide no authority to the Board of Directors to impose surcharges or to amend a unit's percentage interest in common elements except upon an increase in the number of units.

(29) The Bylaws of the Association provide: "The interim percentage interest is subject to adjustment in accordance with paragraph 5 of the Declaration. Such adjustment shall occur as and when additional units and phases are constructed and then only to the extent that the overall value of the condominium is increased by and allocated to the additional units."

(30) The Association's Amended and Restated Declaration of Condominium retains to this date a designation of Unit Q-3 as a three-bedroom and four-bathroom unit with an interim percentage of 1.1053 %.

(31) The family room in Unit Q-3 was used as a fourth bedroom by the Queirolos on multiple occasions.

(32) Pursuant to the Declaration, the Association maintains an exclusive rental agreement with Killington Rental. If a unit owner decides to rent a unit, the owner is required to rent the unit through Killington Rental.

(33) The Queirolos rented their unit as a four-bedroom unit during multiple ski seasons, 1998 through 2001. The Queirolos received higher profits by renting the unit as a four-bedroom, as opposed to a three-bedroom unit.

(34) In renting Unit Q-3 through Killington Rental, the Queirolos specifically requested that their unit be rented as a four-bedroom unit to obtain a higher nightly fee and increase their profit. The fourth bedroom was located in the area designated as the family room.

(35)     The Queirolos did not inform, nor did they seek authorization from, the Association to increase or use Unit Q-3 beyond that provided by the Declaration and delineated in the as-built plans.

(36)     There is no evidence that the unit was actually used as a four-bedroom unit by the seasonal renters.

(37)     There is no evidence of increased usage of the common areas of Highridge Condominiums as a result of the use and rental of the Unit Q-3 family room as a bedroom.

(38)     There is no evidence of increased usage of the common infrastructure, entertainment facilities, waste water, and no evidence of increased repairs and other wear and tear as a result of the use and rental of the family room as a bedroom.

(39)     While the Association claims that a higher lodging capacity at Unit Q-3 because of a fourth bedroom results in a greater consumption of water, there is no evidence as to water use at Unit Q-3.

(40)     There is no evidence that the use and rental of the Unit Q-3 family room as a bedroom negatively or adversely affected the other unit owners at Highridge Condominiums.

(41)     The other unit owners did not pay a disproportionate share of assessments because of the use and rental of the Unit Q-3 family room as a fourth bedroom.

(42)     Title 27, Section 1306(b) of the Vermont Statutes Annotated requires the consent of all apartment owners in order to change the percentage of the

undivided interest of an individual unit. The statute was in place in 1967, prior to the Association's reallocation of the Queirolos' common charges in 2003.

(43) Under the Declaration, the Association can only change the undivided-interest-assessment percentages in only two instances. If new buildings are added to Highridge Condominiums, the percentages are adjusted to reflect the additions. Otherwise, the Association must obtain a unanimous vote of the Highridge Owners Association.

(44) Building Q is the newest building at Highridge Condominiums. There have been no additions since then.

(45) In July 2003, the Association changed the assessment percentage for Unit Q-3 from 1.1053 % to 1.337209 %, based on the use and rental of the family room as a bedroom and because of an extra bathroom.

(46) The Association did not seek a vote of the Highridge Owners Association prior to changing the Unit Q-3 assessment.

(47) The Association assumed that the Queirolos would not have voted in favor of the change in assessments; therefore, the Association assumed the change could not have been accomplished through a vote of the owners.

(48) Under the Bylaws, the Association is permitted to amend assessments where quarterly assessments prove insufficient. However, this ability to amend assessments pertains only to the overall assessment and not to a change of percentage interest for individual unit owners.

(49)     Since July 1, 2003, the Queirolos have not paid the additional assessments levied because of the Association's determination that they have an additional bedroom and bathroom.

(50)     The Queirolos have paid assessments at the original assessment percentage of 1.1053 %.

**CONCLUSIONS OF LAW**

While the Association may have reason to be upset with the Queirolos for using and renting the family room as a fourth bedroom, it cannot punish them by changing their undivided interest percentage for Unit Q-3. Under the Declaration and 27 V.S.A. 1306(b), the Association cannot not alter the undivided interest of each condominium unit without the consent of all the unit owners. The Association admits that it altered the Unit Q-3 undivided interest without the consent of all unit owners. In fact, the Association did not even hold a vote, reasoning that the Queirolos would have voted no. Thus, the Association was in violation of the Declaration and Vermont statute when it altered the undivided percentage interest of Unit Q-3 from 1.1053 % to 1.337209 %. The Unit Q-3 percentage must remain at 1.1053 %, unless condominium units are added to the development or the Association obtains the consent of all unit owners by vote.

The Association argues that the doctrine of unclean hands should be applied to bar the Queirolos from seeking relief from the change in assessment percentage. The doctrine of unclean hands is guided by the maxim that he who comes into equity must come with clean hands. *Starr Farm Beach Campowners Ass'n v. Boylan*, 174 Vt. 503, 506 (2002). While the Queirolos on occasion used the family room as a bedroom, there is no evidence that this usage increased the occupancy of the unit as a whole. Furthermore,

9

there is no evidence that when the Queirolos rented the unit as a four-bedroom, as opposed to a three-bedroom unit, that the seasonal renters used the family room as a fourth bedroom or increased the occupancy of the unit over its intended usage.

The Association seeks to bar the Queirolos from coming into equity at the same time that it seeks to foreclose on the unit (thus invoking relief equitable in nature), even though it was in direct violation of the Declaration and Vermont law by unilaterally changing the undivided interest percentage on the Queirolos' unit. The only reason the Queirolos owe any dues to the Association is because they refuse to pay any assessments over 1.1053 %. As stated above, the Queirolos are right on this point. While the Queirolos may have been in violation of the Declaration for renting the unit as a four-bedroom, the Court will not apply the doctrine of unclean hands so as to bar them from arguing that they were charged incorrectly.

The Association also argues for the application of the business judgment rule. Vermont cases have not set out the applicable legal standard regarding a board's decision to enforce the association's rules. Several out-of-state cases, however, have proceeded by applying a deferential standard of review to a board's actions analogous to the business-judgment rule of corporate law. See *Levandusky v. One Fifth Avenue Apartment Corp.*, 553 N.E.2d 1317, 1320-23 (N.Y. 1990) (exhaustively analyzing and then adopting the business-judgment rule in this context). "Generally, courts will uphold decisions made by the governing board of an owners association as long as they represent good-faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." *Riverside Park Condominiums Unit Owners Association v. Lucas*, 691 N.W.2d 862, 871 (N.D. 2005).

Here, the business judgment rule is inapplicable because the Association's decision to alter the undivided interest was inconsistent with the development's governing documents. The Court notes that under the Amended Declaration of 2008, the Association arguably now has the authority to fine a unit owner for unauthorized occupancy of a non-bedroom as a bedroom. It also arguably has the authority to fine a unit owner for marketing or renting a unit for more bedrooms than the unit is authorized to contain. A decision to fine a unit owner under the Amended Declaration could arguably fall under the business judgment rule, but that is not the issue the Court faces today.

## ORDER

The Court finds in favor of the PLAINTIFFS.

(1) The percentage interest for Unit Q-3 shall be returned to 1.1053 %.

(2) The Plaintiffs do not owe any dues assessed at a percentage interest above 1.1053 %.

(3) Any dues overpaid by the Plaintiffs shall be returned.

(4) The Plaintiffs do not owe any attorney's fees assessed as dues.

(5) The Defendant's action to foreclose on Unit Q-3 is DENIED.


Dated at Rutland, Vermont this _____ day of _____, 2010.


_____
Hon. William Cohen
Superior Court Judge